**Jocelyn SIOSON, Plaintiff**

v.

**KNIGHTS OF COLUMBUS, Defendant.**

**No. CIV.A. 3–99CV1982JCH.**

United States District Court, D. Connecticut.

Aug. 29, 2001.

David S. Doyle, Marcus Law Firm, New Haven, CT, for plaintiff.

Lynn A. Kappelman, Seyfarth, Shaw, Boston, MA, for defendant.

**RULING ON RECONSIDERATION OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [DKT. NO. 14] AND DEFENDANT'S MOTION TO STRIKE PORTIONS OF THE PLAINTIFF'S AFFIDAVIT [DKT. NO. 24]**

HALL, District Judge.

This lawsuit for money damages was removed to this court pursuant to 28 U.S.C. § 1441. The plaintiff, Jocelyn Sioson ("Sioson"), alleges that her employer, the Knights of Columbus (the "Knights"), violated Title VII of the Civil Rights Act of 1964 ("Title VII") and the Connecticut Fair Employment Practices Act ("CFEPA"), Conn. Gen.Stat. § 46(a)—60(a)(1), by discriminating against her on the basis of her national origin.

On March 16, 2001, the Knights filed a motion for summary judgment, which the court granted absent objection on April 28, 2001. On May 7, 2001, Sioson filed a motion for reconsideration, which the court granted. The court therefore opened the judgment entered on April 28, 2001 and now reconsiders the Knights' motion for summary judgment. In addition, the court considers the defendant's motion to strike portions of the plaintiff's affidavit submitted in opposition to the motion for summary judgment.

**I. FACTS**

The following facts are taken from the parties' Local Rule 9(c) statements. Although Siosin did not specifically file a Local Rule 9(c)(2) statement as the Local Rules require, she filed a document entitled "Plaintiff's Counter–Statement of Facts." The court considers the plaintiff's counter-statement to be in response to the Knights' Local Rule 9(c)(1) statement and, therefore, considers any Knights' statement not disputed in the plaintiff's counter-statement to be admitted.

Siosin is a Filipino–American. She currently works as an associate chief underwriter with the Knights. The Knights is a charitable Catholic family fraternal society, founded in 1882 at St. Mary's Church in New Haven, Connecticut. The Knights now operates internationally and provides

numerous benefits and services to its members, including insurance coverage.

Siosin began working with the Knights as a file clerk in 1977, and has been promoted six times since that time. Siosin has received an annual raise each of the twenty-four years she has worked with the Knights. In 1994, Siosin was selected over three white, non-Filipino candidates for one of the newly-created positions of Associate Chief Underwriter. Siosin received this promotion even though she did not have a bachelors' degree, which was a prerequisite for the position. As of May 7, 2001, Siosin continued to be an Associate Chief Underwriter for the Knights. As an Associate Chief Underwriter, Siosin's duties include: classifying applicants for life insurance policies; analyzing insurance risks; and binding the Knights on each life insurance contract ranging in amounts from approximately $1,000 to over $150,000.

Laura Criscuolo ("Criscuolo"), was promoted to the Associate Chief Underwriter position at the same time as Siosin. Both Siosin and Criscuolo reported directly to Scott Hattings ("Hattings"), then the Chief Underwriter. Since receiving their promotions in 1994, both Siosin and Criscuolo have been evaluated annually. The evaluations reflect that their performance is measured based upon a review of their ability to: (1) appropriately classify each insurance applicant to efficiently underwrite their individual life insurance contract; (2) advise other departments on status of insurance applications; and (3) perform other miscellaneous related duties. Siosin's and Criscuolo's overall annual evaluation consisted of a weighted average of each woman's rating in each of these areas. Ninety percent of the weight was placed on the employee's ability to appropriately classify each insurance applicant to efficiently underwrite the individu-

al life insurance contract. Five percent of the weight was placed on the ability to perform the remaining two evaluated tasks.

Annual raises were determined based upon the overall weighted evaluation of each employee's performance in her annual review. In March 1997, Criscuolo received a weighted performance evaluation of 3.95 out of a maximum of 5. Criscuolo's evaluation was .05 shy of a determination that she had "exceeded expectations" as that term is used in the Knights' performance evaluation process. In March 1997, Siosin received a weighted evaluation of 3.0 out of a maximum of 5. As a result of this disparity in their evaluations, in April 1997, Criscuolo received a larger merit increase than Sioson. In April 1998, Criscuolo's overall evaluation resulted in a weighted average of 3.1. Siosin's overall evaluation resulted in a weighted average of 3.0. Both women received the same merit increase in 1998.

In February of 1997, Hattings asked Siosin to reduce the number of personal conversations she engaged in with friends during work hours. Specifically, Hattings requested that Siosin watch her "chatter." At the same time, Hattings requested that Siosin strictly adhere to the twenty-minute break schedule and punctually return from breaks. Hattings did not issue a written warning to Siosin.

In 1997, Michelle Franco ("Franco"), a Filipino–American employee of the Knights, filed a grievance against the Knights. In March of 1997, the Knights learned that someone had disclosed privileged legal information to union officials and the grievant concerning the Knights' legal position during the grievance proceeding. The Knights interviewed all management level employees, many of whom indicated that Siosin had been the source of the information. The Knights interviewed Siosin about her knowledge,

and she admitted knowing about the grievance proceeding and revealing the information she had to Franco. As a result of the grievance proceedings, Franco was promoted to the position of junior underwriter.

In July 1997, Siosin approached Hattings and asked why he was assigning Criscuolo files for which she would underwrite larger insurance policies but not assigning the same to Siosin. Hattings showed Siosin three errors in her files that had caused him to question her work.

In November 1997, Hattings asked Siosin to move to a desk a few feet away from her original desk for management reasons. Following the notice of the relocation, Siosin sent a letter to Tom Lynch ("Lynch"), Vice President of Human Resources, alleging that the relocation was racially motivated because Franco was going to be sitting next to Siosin.

In March 1998, Lynch and the Director of Personnel, Mary Antonyshyn ("Antonyshyn"), met with Siosin twice to discuss her allegation. Lynch and Antonyshyn further investigated the complaint by interviewing members of Siosin's unit, including Hattings and Franco.

## II. DISCUSSION

### A. Standard

In a motion for summary judgement, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgement as a matter of law. *See* Fed. R.Civ.P.56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *White v. ABCO Engineering Corp.,* 221 F.3d 293, 300 (2d Cir. 2000). The burden of showing that no genuine factual dispute exists rests upon the moving party. *See Carlton v. Mystic Transp., Inc.,* 202 F.3d 129, 133 (2d Cir.

2000) (citing *Gallo v. Prudential Residential Servs., Ltd. Partnership,* 22 F.3d 1219, 1223 (2d Cir.1994)). Once the moving party has met its burden, in order to defeat the motion, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial," *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505, and present such evidence as would allow a jury to find in her favor. *See Graham v. Long Island R.R.,* 230 F.3d 34, 38 (2d Cir.2000).

In assessing the record, the trial court must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgement is sought. *See Anderson,* 477 U.S. at 255, 106 S.Ct. 2505; *Graham,* 230 F.3d at 38. "This remedy that precludes a trial is properly granted only when no rational finder of fact could find in favor of the non-moving party." *Carlton* 202 F.3d at 134. When reasonable persons, applying the proper legal standards, could differ in their responses to the questions raised on the basis of the evidence presented, the question is left to the jury. *See Sologub v. City of New York,* 202 F.3d 175, 178 (2d Cir.2000).

### B. Analysis

Siosin alleges that Hattings discriminated against her by making disparaging comments concerning her native language, by selectively enforcing company policies against Siosin, and by continuously treating Siosin in a manner designed to demean and humiliate her. While the complaint does not specify the specific actions the plaintiff alleges were discriminatory, it appears from papers submitted to the court on this motion that Siosin's allegation of discrimination stems from several events. First, Siosin alleges that she was discriminated against because Hattings gave a non-Filipino co-worker a higher merit increase in salary. Second, Siosin alleges Hattings discriminated against her by re-

locating her desk so that she would not sit next to Franco. Third, Siosin alleges that Hattings discriminated against her by instructing her to reduce the number of personal conversations during the work day and to strictly observe the twenty-minute time limit for breaks. Fourth, Siosin alleges that Hattings discriminated against her by expressing a lack of confidence in her work and by assigning her less difficult work than Criscuolo. Finally, Siosin alleges that she was singled out for questioning when the Knights learned that privileged information was leaked about a grievance concerning Franco.

### 1. Statute of Limitations

The Knights argue that at least some of Siosin's allegations are barred by the statute of limitations under Connecticut General Statutes § 46a–82(e), which provides that a complaint of discrimination filed with the Connecticut Commission on Human Rights and Opportunities ("CCHRO") must be filed "within one hundred and eighty days after the alleged act of discrimination." Conn. Gen.Stat. § 46a–82(e). Siosin does not respond to the Knights' argument.

Siosin's charge with the CCHRO was filed on March 18, 1997. Therefore, any events predating September 19, 1997 are time-barred under Connecticut law. Such events include: (1) Hattings' instruction in February 1997 to Siosin to watch her "chatter;" (2) the April 1997 merit increase; and (3) the March 1997 investigation regarding the disclosure of confidential information to Franco.

Siosin has, however, brought claims under both state and federal law. Borrowing the state statute of limitations for the federal civil rights claims may be inappropriate. *Burnett v. Grattan,* 468 U.S. 42, 55, 104 S.Ct. 2924, 82 L.Ed.2d 36 (1984) ("Both the practical differences between

the administrative proceeding contemplated by the [state] statute and a civil action in a federal court, and the divergence in the objectives of the state administrative procedure to resolve employment discrimination suits and a federal cause of action to vindicate constitutional rights, lead us to conclude that borrowing the limitations period from [the state] was inappropriate."). Because the Knights have not established and do not even argue that the state statute of limitations is appropriate for the federal claims, the court grants the motion for summary judgment as to state-law claims pre-dating September 17, 1997 and denies the motion as to all federal claims.

### 2. Employment Discrimination

 The same standard applies to both the CFEPA and Title VII claims brought in this cause of action. *See State v. Comm'n on Human Rights & Opportunities,* 211 Conn. 464, 470, 559 A.2d 1120 (1989); *Leak v. United Technologies Corp.,* 81 F.Supp.2d 373, 375–76 (D.Conn.1999). Under the burden-shifting rules set forth in *McDonnell Douglas v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), a plaintiff has the initial burden of making out a prima facie case of discrimination. *See id.* at 802, 93 S.Ct. 1817; *Farias v. Instructional Systems, Inc.,* 259 F.3d 91, 96–98 (2d Cir.2001). To make out a prima facie case, a plaintiff must demonstrate "(1) membership in a protected class; (2) satisfactory job performance; (3) termination from employment or other adverse employment action; and (4) the ultimate filling of the position with an individual who is not a member of the protected class." *Farias,* 259 F.3d 91, 96–98 (citing *Quaratino v. Tiffany & Co.,* 71 F.3d 58, 64 (2d Cir.1995)). "Alternatively, the fourth prong of the prima facie case may be satisfied if the plaintiff can demonstrate that the discharge or adverse employment

action occurred under circumstances giving rise to an inference of discrimination on the basis of plaintiff's membership in that class." *Id.* (citing *McLee v. Chrysler Corp.,* 109 F.3d 130, 135 (2d Cir.1997)); *see also James v. New York Racing Ass'n,* 233 F.3d 149, 153–54 (2d Cir.2000).

If a plaintiff establishes a prima facie case, a presumption of discrimination is created and the burden of production shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the adverse employment action or termination. *McDonnell Douglas,* 411 U.S. at 802–03, 93 S.Ct. 1817; *Farias,* 259 F.3d 91, 96–98 (citing *James,* 233 F.3d at 154; *Quaratino,* 71 F.3d at 64). The defendant is not required to prove that the articulated reason actually motivated its actions. *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) ("The defendant need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff."). "If the defendant fails to discharge the burden by presenting a nondiscriminatory reason, the plaintiff will prevail (assuming the other aspects of the prima facie case are not contested)." *James,* 233 F.3d at 154.

If the defendant bears its burden of production, the presumption drops out of the analysis, and the defendant " 'will be entitled to summary judgment ... unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination.' " *Farias,* 259 F.3d 91, 98–99 (quoting *James,* 233 F.3d at 154). Evidence that the defendant's articulated nondiscriminatory reason is false, when added to the prima facie case, may or may not be "sufficient to support a reasonable inference that prohibited discrimination occurred" and warrant submitting the case

to the jury. *James,* 233 F.3d at 156; *see also Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 148, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) ("[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.").

■ The defendant does not dispute that Siosin falls within a protected class. Nor, for the purposes of this motion, does it dispute that Siosin was qualified to perform the duties of an Associate Chief Underwriter. The Knights argues that, with respect to the relocation of her desk, Siosin did not suffer a negative employment action and therefore fails to establish a prima facie case. With respect to the other employment actions of which Siosin complains, the Knights argues it has presented legitimate, non-discriminatory reasons for each of those actions, and Siosin has failed to produce any evidence of pretext.

Siosin has not come forward with any evidence that moving her desk was an adverse employment action. Therefore, the court reaffirms its previous ruling with respect to the relocation of the desk and grants the motion for summary judgment with respect to that claim.

■ With regard to the remaining employment actions, Siosin argues that she has come forward with evidence that the Knights' reasons for the employment actions are pretextual and were motivated, at least in part, by discriminatory intent. In order to survive summary judgment by overcoming the Knights' proffered legitimate reasons for its actions, Siosin "must establish a genuine issue of material fact either through direct, statistical or circumstantial evidence as to whether the employer's reason ... is false and as to whether it is more likely that a discrimina-

tory reason motivated the employer to make the adverse employment decision." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 401 (2d Cir.1998) (citation and internal quotation marks omitted). A "plaintiff may prevail only if an employer's proffered reasons are shown to be a pretext for discrimination, either because the pretext finding itself points to discrimination or because other evidence in the record points in that direction—or both." *Fisher v. Vassar College*, 114 F.3d 1332, 1339 (2d Cir.1997) (en banc). Siosin cannot survive a motion for summary judgment merely by asserting that intent is at issue. *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir.1985). She must present "concrete particulars" that substantiate her claim of discrimination. *Id.*

■ Siosin fails to present "concrete particulars" to substantiate her claim. She does not present any evidence to demonstrate that the proffered reasons for the various actions were false. Nor does she present any evidence that a motivating reason behind the actions was discrimination. First, Siosin admits that Criscuolo received a better performance evaluation in 1997 and received a higher merit increase because of the better performance evaluation. The two employees received the same merit increase the following year, supporting the Knights' argument that the difference in the pay increase was wholly attributable to performance. Siosin provides no evidence that the difference was attributable to anything other than performance.

■ Similarly, Siosin provides no evidence that Siosin was not assigned files that required her to underwrite larger insurance policies while Criscuolo was because of Siosin's race or national origin. The Knights argues that the difference in the assignments given to the two employees was due to errors in Siosin's work.

Siosin does not dispute that Hattings found errors in her work nor does she provide any evidence that the errors were a pretext for some other discriminatory reason for the difference in assignments.

■ With regard to Hattings' instruction to Siosin to adhere to the coffee break time limits, Siosin admits that she had been tardy returning from breaks and that she does not know whether Hattings spoke to non-Filipino co-workers about strictly observing the time limits on coffee breaks. Further, Siosin does not offer any other evidence that she was singled out and instructed about coffee breaks because of her race or ethnic background.

■ The Knights argue that Hattings told Siosin to watch her "chatter" because of the frequency of her personal conversations. Siosin argues that the reprimand was discriminatory because she often spoke to Franco in their native language and because Hattings was referring to those conversations as "chatter." However, Siosin provides no evidence that she was not talking with friends about personal matters during work, that other employees were not similarly warned, or that the word "chatter" by itself evidences discriminatory animus. Siosin relies solely on her belief that Hattings instruction for her to limit her personal conversations was motivated by discriminatory intent. By itself, Siosin's conclusory allegation of intent is insufficient as evidence of pretext. *Meiri*, 759 F.2d at 998.

■ Siosin similarly provides no evidence that the reasons given by the Knights for interviewing her in relation to the privileged information disclosed to Franco or investigating her claim of discrimination in the manner it did were pretextual reasons. The Knights argue that all management personnel were questioned and that several indicated Siosin was the

source of the information. Siosin also admits that she shared information she learned about the grievance with Franco. Therefore, no evidence exists which suggests that the Knights' reasons for interviewing or investigating Siosin were pretext for discrimination.

Because Siosin has not established that there is a genuine issue of material fact with regard to whether the proffered reasons for the actions taken by the Knights were pretextual, the court reaffirms its prior decision and grants the defendant's motion for summary judgment as to all claims. Even considering the statements made in her affidavit, Siosin has not demonstrated a genuine issue of material fact. Therefore, the court denies the defendant's motion to strike portions of the plaintiff's affidavit [Dkt. No. 24] as moot.

## III. CONCLUSION

For the foregoing reasons, after reconsideration, the court reaffirms its prior decision granting the defendant's motion for summary judgment [Dkt. No. 14]. The defendant's motion to strike certain portions of the plaintiff's affidavit [Dkt. No. 24] is DENIED AS MOOT. The case is dismissed in its entirety and the clerk is directed to close the file.

**SO ORDERED.**